UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FRANKLIN CASTANO, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. 18-12488-RGS |
| BRAD COWEN, | ) ) ) | |
| Respondent. | ) ) ) | |

REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS

December 27, 2019

Boal, M.J.

On December 3, 2018, pro se petitioner Franklin Castano filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). Docket No. 1. For the following reasons, this Court recommends[1] that the District Judge assigned to this case deny the Petition.

I.   FACTUAL AND PROCEDURAL BACKGROUND

   A.   The Underlying Criminal Case

On September 23, 2015, an Essex Superior Court jury convicted Castano of murder in the first degree on a theory of deliberate premeditation in violation of M.G.L. c. 265, § 1, and unlawful possession of a firearm in violation of M.G.L. c. 269, § 10(h). Supplemental Answer ("SA") 79. The trial judge sentenced Castano to the mandatory term of imprisonment for life without parole on the murder conviction, and two years in a house of correction on the firearm

---

[1] On January 30, 2019, the District Court referred this matter to the undersigned for a report and recommendation. Docket No. 14.

1

conviction. SA 79-80.

Castano timely appealed. SA 79. On October 6, 2017, the Massachusetts Supreme Judicial Court ("SJC") affirmed Castano's convictions. Commonwealth v. Castano, 478 Mass. 75 (2017).

B.  The Facts Underlying Castano's Conviction

The following recitation of the facts by the SJC is presumed to be correct. See 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002):

> Background. On the morning of February 20, 2014, the defendant, accompanied by two friends, walked into the Lynn police station. One of the friends, Alvaro Garcia, informed police that the defendant's girl friend was dead and that the defendant had killed her. The defendant was placed under arrest, and police responded to the Peabody apartment that the defendant shared with his girl friend. There, they found her dead with a gunshot wound to the head. Two spent casings were found nearby, but no firearm was observed or recovered.
>
> ***
>
> 1. The motion to suppress. The motion judge found the following facts, which are not in dispute. The defendant, who is not fluent in English, was booked at the Lynn police station with the assistance of Officer Francisco Gomez, who is bilingual. Throughout the course of the day, Gomez administered Miranda rights to the defendant, in Spanish, at least four times, including at the Lynn police station and at the Peabody police station. Soon after the first provision of Miranda rights, the defendant invoked his right to counsel.
>
> The questioning did not immediately cease. The defendant was subjected to two sets of questions at the Peabody police station without ever having the opportunity to speak to a lawyer. Both sets of postinvocation questions concerned the disposal of the firearm that police, at that time, believed the defendant had used to kill the victim.
>
> The first set of questions came from Peabody police Officer Mark Saia, who asked the defendant where "the gun" was. The defendant replied that the threw it out of his motor vehicle window near the apartment complex where the killing occurred. Saia told the defendant that it was important to locate the gun because of that area's proximity to places where children might be present. The officer asked the defendant for more detail about where he had

disposed of the gun.  The defendant said he had turned to the left out of the apartment complex and threw the weapon out the vehicle window near a dry cleaner.  Saia communicated that information to other officers at the scene.  They did not find the gun.

The second set of questions came from Peabody police Detective Stephanie Lane.  Lane had responded to the apartment complex on the morning of the events in question.  She was familiar with the area described by the defendant.  She was aware that both a church (with a school and day care facility) and a preschool were located nearby.  She also was aware that the apartment complex itself was home to a number of children.  Lane further knew that police had not recovered the weapon from the apartment or from their subsequent search of its environs.

When Lane returned to the station, she spoke to the defendant in the holding cell area and essentially repeated the questions asked by Saia.  The defendant provided the same information and described the firearm as silver in color.  Lane asked if the defendant would be willing to accompany her and other officers to help find the firearm.  He agreed to cooperate.  Police placed the defendant in the back of a cruiser and drove to the area adjacent to the apartment complex.  The defendant pointed out the direction in which he had thrown the firearm.  Still, police never recovered the weapon.

The motion judge ruled that the defendant's responses to these two set of inquiries were admissible at trial under the public safety exception to the Miranda exclusionary rule, as first established in New York v. Quarles, 467 U.S. 649, 655-656, 104 S. Ct. 2626, 81 L.Ed.2d 550 (1984).  He concluded that (1) the Quarles exception extends to postinvocation questioning and (2) it applied here because officers had an objectively reasonable need to protect the public from danger when they asked the defendant about the location of the gun.

2. The evidence at trial.  We summarize the facts at trial as the jury could have found them.

a. Communication with Garcia.  Garcia, a friend of the defendant for several years, testified about communication he had had with the defendant on the night of the killing and the morning after.  Garcia also knew the victim, having nicknamed her "Explosive" because she was "the kind of person you [could] meet and connect [with] right away" and "[a]lways happy."

On the night of February 19, 2014, Garcia was working at his job for a cleaning company.  Around 10:30 P.M., the defendant began posting comments directed at Garcia on a social networking Web site, one of which struck Garcia as unusual.  As a result, Garcia telephoned the defendant, who said only that he would call Garcia later.  About an hour later, the defendant

3

called Garcia and asked him to come by the defendant's apartment because the defendant needed to talk to him. The defendant sounded "weird" and "nervous." Garcia tentatively agreed to come by the apartment, or at least call the defendant, when his shift ended at 2 A.M. on February 20.

The defendant subsequently sent Garcia another message, through the messaging application WhatsApp, asking if he had finished his shift yet. Garcia asked why the defendant wanted him to come by the apartment. The defendant replied that he had "problems" or "a thing on [his] hands." The defendant also sent an emoji[2] of a face with X's for eyes,[3] and the word "Explosive." At that point, Garcia knew that "something was happening," and he told the defendant that he would call the defendant after work.

Garcia sent the defendant a text message when he was leaving work around 2 A.M., and again when he reached his home around 2:30 A.M., but the defendant did not respond to either. Garcia did not hear from the defendant again until around 7 A.M., when the defendant called on the telephone while Garcia was working at his second job. The defendant again told Garcia that he had "problems"—"something serious" or "something big"—and that he wanted Garcia to come by his apartment. At this point, the defendant sounded "desperate."

Garcia left work and went to the defendant's apartment in Peabody. When he arrived, the defendant opened the door to let Garcia in, turned, and said, "I'm fucked." Garcia asked what happened, and the defendant said, "Explosive is dead." The defendant told Garcia that the victim was "in the other room," but he did not explain what happened before Garcia got scared and decided to leave.

Garcia returned to his home in Lynn and spoke with his wife; they agreed to go to the Lynn police station. At that point, the defendant telephoned Garcia and said that he was on his way to Garcia's house. Garcia and his

---

[2] Footnote 2 of the SJC's decision, inserted at this point, states:

> An emoji is "any of various small images, symbols, or icons used in text fields in electronic communication (as in text messages, [electronic] mail, and social media) to express the emotional attitude of the writer, convey information succinctly, communicate a message playfully without using words, etc." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/emoji [https://perma.cc/QUC5-SA8E].

[3] Footnote 3 of the SJC's decision, inserted at this point, contained the following image:



4

wife waited in the vehicle for the defendant to arrive, planning to accompany him to the police station.

When the defendant arrived, he leaned in the driver's side window of Garcia's vehicle. Garcia's wife asked the defendant what had happened. The defendant explained that he was counting money at a table, upon which there was a gun. According to the defendant, the victim grabbed the gun and said, "I don't know why you have this in here." The victim then "dropped" the gun back onto the table. It fell off the table, and the defendant "grabbed" it. After grabbing the gun, the defendant said something along the lines of "leave me alone, asshole" and swung his arm backward. The defendant said the motion caused him to shoot the victim, and then he got scared and a second shot fired into the wall. The defendant told Garcia it was an accident and he wanted to "do the right thing" and surrender himself to police.

b. <u>Defendant's statements to police</u>. The testimony at trial regarding the defendant's statements to police was essentially consistent with the testimony at the suppression hearing, discussed above. Officer Gomez and Detective Lane testified that the defendant told them that he "threw [the gun] out of the car" at some point after the incident. Both Officer Saia and Detective Lane described police efforts to locate the gun based on information given to them by the defendant.

c. <u>Physical evidence</u>. Although police never recovered the weapon, the Commonwealth presented other pieces of physical evidence linking the defendant to the crime. When police entered the apartment, it appeared relatively clean and undisturbed, other than a small lamp near the victim's feet that had been knocked over and a suitcase on the floor of the room where the victim was found.

Photographs of the inside of the apartment showed that police discovered the victim lying face-down on a small couch, with a sweatshirt covering her head. Blood had pooled in the corner of the couch next to the victim's head and on the floor nearby. Police found one earring in a crevice of the couch; the other remained in the victim's left ear.

Police also located two spent shell casings inside the apartment—one on the floor near the couch and one on a windowsill in the corner of the same room. They recovered two spent projectiles—one from inside the arm of the couch, and one from inside the wall above the victim's feet.

The exhibits also included two pairs of examination gloves and one pair of winter gloves that police found sitting out on a coffee table and a bureau inside the apartment. The outside of one pair of examination gloves tested positive for gunshot residue.

5

d. <u>Motive evidence</u>. The Commonwealth's theory of motive was based largely on the testimony of two acquaintances of the victim—a cousin and a friend. The cousin testified that she saw the victim on February 13 and 14, 2014. She testified that on February 13, the victim told her that, the night before, she and the defendant had gotten into an argument over the way the defendant opened a bag of cotton balls. The argument progressed to the point where the victim told the defendant she wanted to end their relationship. According to the cousin, the victim also had received gifts from the defendant for their anniversary, on February 13, but had told the defendant that she did not want them.

The friend testified that, on the Monday before she was killed, the victim had told the friend that she was planning to end her relationship with the defendant and that his belongings were already packed. The victim said that "[s]he wanted him out of the apartment so she could continue her life without him."

There also was testimony from the leasing agent for the apartment complex where the defendant and the victim lived. The leasing agent testified that on the afternoon of February 19, 2014, the victim came into her office to obtain a roommate release form. The leasing agent provided the victim with the form, along with instructions for completing it.

e. <u>Medical evidence</u>. The medical examiner testified to her autopsy findings underlying her opinion that the victim died from a gunshot wound to the head. She described the entrance wound above the victim's right temple and the exit wound in the lower, left part of her skull. She also opined that the entrance wound was a "contact wound," meaning the gun was fired while in contact with the victim's head.

The autopsy revealed other injuries. The victim had abrasions around her neck, roughly matching the pattern of a necklace she was wearing. The abrasions, along with petechial hemorrhages in the victim's eye and face, indicated possible ligature strangulation. The medical examiner also observed bruising and abrasions on the victim's right cheek, as well as a bruise on the back of her left hand.

f. <u>The defense</u>. The theory of the defense was that the victim's death was accidental. The defendant did not put on his own case. However, in addition to the evidence already discussed, the defendant, without objection, elicited testimony from Garcia and Garcia's wife about how the defendant had told them, before they all went to the police station, that the shooting was an accident. He argued in closing that the shooting was accidental and there was reasonable doubt about his alleged motive.

Castano, 478 Mass. at 75-81.

II.     HABEAS CORPUS STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"), presents a "formidable barrier" limiting the availability of habeas relief where state courts have adjudicated the merits of a prisoner's claims. Burt v. Titlow, 571 U.S. 12, 19 (2013). Castano may not obtain federal habeas relief under 28 U.S.C. § 2254(d) unless he can show that the SJC's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In other words, state court decisions merit substantial deference.

As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof. Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011). If a state court's decision "was reasonable, it cannot be disturbed." Hardy v. Cross, 565 U.S. 65, 72 (2011); see Parker v. Matthews, 567 U.S. 37, 38 (2012) (emphasizing federal habeas courts may not "second-guess the reasonable decisions of state courts" (internal quotation and citation omitted)). When applying this strict standard, a court must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Miller–El v. Cockrell, 537 U.S. 322, 340–41 (2003).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Id. at

7

406 (internal citation omitted).

The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407.  It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Once again, this assessment is limited to federal law as articulated by the Supreme Court, and not the lower federal courts. See Lopez v. Smith, 574 U.S. 1, 6 (2014).  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Matthews, 567 U.S. at 48.

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement to relief.  Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003); accord McCambridge v. Hall, 303 F.3d 24, 36–37 (1st Cir. 2002).  Rather, relief is available only where a state court's "determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002); see also Harrington, 562 U.S. at 103 (requiring a petitioner to "show that the state court's ruling . . . was so lacking in justification that there was an . . . error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement").

8

Further, even if a state court decision is contrary to, or an unreasonable application of, established federal law, a petitioner is not entitled to habeas relief unless harm resulted. The standard for determining whether relief must be granted is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."[4] Fry v. Pliler, 551 U.S. 112, 121 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)); see also Connolly v. Roden, 752 F.3d 505, 510–11 (1st Cir. 2014).

III.  ANALYSIS

    A.  The SJC Reasonably Concluded That Any Constitutional Error In The Admission Of Castano's Statements To The Police About The Location Of The Gun Was Harmless

In Ground One of his Petition, Castano argues that his statement about the location of the gun should have been suppressed because he asserted his right to counsel and there was no public safety exception justifying the officer's questioning. Docket No. 1 at 8; Docket No. 25 at 5-15. This Court finds that Castano is not entitled to habeas relief on Ground One.

    1.  Standard of Review

As a preliminary matter, this Court must decide the appropriate standard of review on this claim. The AEDPA deferential standard applies only to a "claim that was adjudicated on the merits in State court proceedings." Pike v. Guarino, 492 F.3d 61, 67 (1st Cir. 2007) (citing 28 U.S.C. § 2254(d)). "If the federal claim was never addressed by the state court, federal review is de novo." Id. (citing Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001)). Castano argues that because the SJC never ruled on this issue, review is de novo. Docket No. 25 at 6. Castano is incorrect.

"A matter is adjudicated on the merits if there is a decision finally resolving the parties'

---

[4] The Court refers to this standard as the "Brecht test" below.

9

claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground." Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010) (citing Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir. 2007); internal quotation marks omitted). Adjudication on the merits "does not require that there be an opinion from the state court explaining the state court's reasoning" and "a state court need not cite or even be aware of [Supreme Court] cases under § 2254(d)." Richter, 562 U.S. at 98 (citations omitted). "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 568 U.S. 289, 301 (2013). "The presumption may be overcome when there is reason to think that some other explanation for the state court's decision is more likely." Richter, 562 U.S. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Here, there can be no dispute that the SJC's disposition of Castano's claim regarding his statements about the location of the gun was a final decision with res judicata effect. Castano is correct that the SJC determined that it need not decide whether New York v. Quarles, 467 U.S. 649 (1984), might apply in a postinvocation setting such as that presented by Castano's case.[5] However, that is because the SJC assumed, without deciding, that a constitutional violation had occurred. Castano, 478 Mass. at 82. The SJC then proceeded to determine that even if such a constitutional violation occurred, it was harmless and, therefore, it did not require reversal. Id. In so doing, the SJC relied on Commonwealth v. Dagraca, 447 Mass. 546 (2006), which cited Commonwealth v. Perez, 411 Mass. 249 (1991), which in turn quotes the Supreme Court's

---

[5] In New York v. Quarles, the Supreme Court held that there is a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence. Quarles, 467 U.S. at 655-656.

decision in Chapman v. California, 386 U.S. 18 (1967), which established the test for harmless constitutional error.[6] Thus, the SJC addressed the merits of Castano's federal claim. See Connolly, 752 F.3d at 511, n. 11 (where SJC did not explicitly cite Chapman but instead relied on identical state law doctrine rooted in the federal case, the First Circuit treated that approach as an application of federal law). Accordingly, this Court finds that the SJC's decision was an adjudication on the merits of Castano's claim and the AEDPA standard of review applies.

    2.       The SJC's Decision Was Neither Contrary To, Nor An Unreasonable Application Of, Clearly Established Federal Law[7]

When, as here, a state court finds that a constitutional error was harmless beyond a reasonable doubt, "a federal court on habeas review may choose between two equally valid options." Connolly, 752 F.3d at 511. The court may assess whether the harmlessness determination was itself unreasonable and then move on the Brecht test only if the state court's decision was an unreasonable application of Chapman. Id. "Alternatively, the court may begin with the Brecht test directly." Id. "There is a clear logic to [this framework]: if an error had a 'substantial and injurious' effect on a jury's verdict (Brecht standard), then it is necessarily unreasonable to conclude that the error was harmless beyond a reasonable doubt. . ." Id.

This case lends itself to the first approach because Castano has not met his burden to make a threshold showing that the SJC's determination that any error was harmless under Chapman was unreasonable. See id. "An unreasonable application of Chapman must be objectively unreasonable, not merely wrong; even clear error will not suffice." Id. at 513

---

[6] Chapman held that "before a constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24.

[7] Castano also argues that admission of his statements violated the Massachusetts Declaration of Rights. Docket No. 1 at 12-13. Such argument, however, raises potential violations of state law not cognizable on habeas review. See Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006).

(quoting White v. Woodall, 572 U.S. 415, 419 (2014); internal modifications omitted).  "The harmless error inquiry depends significantly on the facts and is guided largely by the strength of the parties' cases."  Id. (citations omitted).

The Commonwealth's case against Castano was supported by strong evidence other than Castano's statements to the police about the location of the gun.  Indeed, as the SJC noted, "the gun itself was not an important piece of evidence in the case, given that it was never recovered and that the victim's cause of death—a gunshot wound to the head—was never in dispute."  Castano, 478 Mass. at 83.  Physical evidence as well as substantial evidence of premeditation and motive supported the jury's verdict.  In assessing harmlessness, the SJC went over that evidence in meticulous detail.  See id. at 82-85.  Among other things, the SJC noted that that the evidence showed that the gunshot wound was likely fired in a "downward trajectory" through the victim's head and into the arm of the couch; that the victim was found lying face down, with her head pressed into the corner of the couch and her feet in the air; that there was evidence of abrasions on the victim's neck, petechial hemorrhages in her face; and bruising to her head; and that there was no evidence that Castano ever called 911 or otherwise sought to aid the victim, all of which refuted Castano's accident theory.  Id.  This Court, therefore, cannot say that the SJC's conclusion that "the totality of the evidence so overwhelmingly refutes the defendant's accident defense that we are convinced beyond a reasonable doubt that no reasonable jury would have been affected in their deliberations" by the testimony regarding Castano's statements about the location of the gun was an unreasonable application of Chapman.  Accordingly, Castano is not entitled to relief on Ground One.

      B.      <u>Ground Two Raises Issues Of State Law Not Cognizable On Habeas Review</u>

"Errors based on violations of state law are not within the reach of federal habeas

petitions unless there is a federal constitutional claim raised." Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) (citations omitted). Habeas relief may be available where the application of state law rises to the level of a due process violation. Id. However, the state court's ruling must be "so arbitrary or capricious as to constitute an independent due process . . . violation." Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011) (citation omitted). "The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly." Id. (citation and internal quotation marks omitted). "[T]he absence of an on-point pronouncement from the Supreme Court leaves hanging by the slimmest of threads the petitioner's claim that the state court's admission" of contested evidence constituted a violation of due process." Id. at 485 (citation omitted). In evaluating the petitioner's claim, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting this presumption by clear and convincing evidence. Id.

The trial judge admitted statements of the victim, to her cousin and her friend, that she was planning to end her relationship with Castano under the hearsay exception for state of mind as proof of the defendant's motive to kill the victim. See Castano, 478 Mass. at 85. In affirming the trial judge's decision on this point, the SJC relied on the Massachusetts Rules of Evidence and Massachusetts law. See id. In Ground Two of the Petition, Castano argues that it was an abuse of discretion to admit those statements because there was no evidence that Castano knew the victim's state of mind. Docket No. 1 at 17-19; Docket No. 25 at 16-19.

Thus, Castano's claim presents only issues of state law that are beyond the review of this Court on a habeas petition. He has not argued, let alone shown, an independent due process violation. Accordingly, this Court finds that Ground Two presents issues of state law not

cognizable on habeas review.[8]

      C.      Castano's Challenge To The Commonwealth's Ballistic Expert Has No Merit

Castano challenges the Commonwealth's ballistic expert, claiming that he was not competent to testify that the bullet that killed the victim traveled in a downward trajectory. Docket No. 1 at 20-22; Docket No. 25 at 20-23. That claim fails for several reasons.

      1.      Procedural Default

First, habeas review is barred because the SJC's decision was based on an independent and adequate state procedural ground. "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

The First Circuit has consistently held that the Massachusetts contemporaneous objection rule, which requires a party to make their objection known at the time of the ruling, is an independent and adequate state procedural ground that precludes federal collateral review. Janosky v. St. Amand, 594 F.3d 39, 44 (1st Cir. 2010) (citations omitted). Here, as the SJC noted, Castano did not object to the ballistic expert's testimony at trial. Castano, 478 Mass. at 87. That the SJC appears to have considered his claim under a miscarriage of justice standard,

---

[8] Castano states, in passing, that he objected to this evidence at trial on confrontation clause grounds. Docket No. 25 at 16, 19. To the extent that he attempts to raise a confrontation clause claim now, that claim was not presented to the SJC and it is, therefore, unexhausted. SA 48-55. See Clements v. Maloney, 485 F.3d 158, 162 (1st Cir. 2007) (in order to properly exhaust a federal claim, the petitioner must fairly present such claim within the four corners of his application for further appellate review to the SJC).

does not constitute a waiver of the contemporaneous objection rule. Muller v. Goguen, 385 F. Supp. 3d 121, 128 (D. Mass. 2019) (citing cases). Indeed, Castano conceded in his brief to the SJC that his counsel did not make a contemporaneous objection at trial and that substantial likelihood of miscarriage of justice was therefore the appropriate standard of review. SA 61. Accordingly, this Court finds that Castano procedurally defaulted this claim and, therefore, habeas review is barred.

Castano alleges that his counsel was ineffective in not hiring a ballistics expert to testify at trial.[9] Docket No. 25 at 22. It is not clear whether Castano is attempting to use this ineffective assistance of counsel claim as an attempt to provide cause for the procedural default or as a freestanding claim. Either way, he cannot bring an ineffective counsel claim now because such claim was not exhausted in state court. See Lynch v. Ficco, 438 F.3d 35, 46 (1st Cir. 2006) ("[A] federal habeas petitioner trying to excuse his procedural default by showing ineffective assistance of counsel as cause must have first presented the ineffective assistance claim to the state court."); Gunter v. Maloney, 291 F.3d 74, 82, n. 1 (1st Cir. 2002) (ineffective assistance claim failed whether raised as cause for a procedural default or as freestanding claim because it was not presented to the state court). Because Castano never presented this issue to the state court, he may not raise it now on a habeas petition.

    2.    <u>Ground Three Raises No Constitutional Or Federal Law Issues</u>

Castano challenged the Commonwealth's ballistic expert, and the SJC affirmed the trial

---

[9] On May 6, 2019, Castano filed a motion for funding for a trajectory expert or, in the alternative, for a stay. Docket No. 19. Castano requested such funds to support his contention that the Commonwealth's ballistics expert at trial was not qualified. This Court denied the motion without prejudice. Docket No. 22. To the extent that Castano is now renewing this request, see Docket No. 25 at 23, this Court denies it. Castano has not presented any specific allegations to give this Court a reason to believe that he may, if the facts are fully developed, demonstrate that he is entitled to relief. See Donald v. Spencer, 656 F.3d 14, 16 (1st Cir. 2011).

court's decision, on state law grounds.  As stated above, habeas review is limited to issues of federal statutory or constitutional law.  Kater v. Maloney, 459 F.3d at 61.  To the extent that Castano relies on the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), a habeas petition is not the appropriate vehicle for challenging the admission of evidence pursuant to such cases.  Robinson v. St. Amand, No. 08-11535-RGS, 2010 WL 1257978, at *8 (D. Mass. Mar. 15, 2010) (citing cases) (R&R adopted by 2010 WL 1257979) ("Daubert/Kumho 'address the Federal Rules of Evidence, not the United States Constitution.  They are not binding on state courts, and they do not help a habeas petitioner to show that he is 'in custody in violation of the Constitution or laws or treaties of the United States.'").  Thus, a claim that a state court failed to follow Daubert states a claim of violation of a state's evidentiary rule, and "warrants federal habeas corpus relief only when such violation results in the denial of fundamental fairness, and concomitantly, a violation of due process." Id. (citation omitted).

      Here, the record would not support a finding that the ballistic's expert testimony resulted in a fundamentally unfair trial.  In connection with this claim, the SJC noted that:

> The evidence showed that the victim was found lying in her stomach with the left side of her face pressed into the corner of a small couch.  The medical examiner testified that the fatal shot entered the victim's skull near the right temple and exited through the back left side of the skull.  There was a bullet hole, with hairs around it, in the armrest nearest the victim's head.  Investigators retrieved a bullet buried inside the armrest of the couch.

Castano, 478 Mass. at 87.  Considering that evidence, the SJC reasonably concluded that "mere common sense" supported the ballistic expert's testimony that the bullet traveled in a downward trajectory.  Id.  Thus, it was not necessary for "an expert to draw a straight line between three points—from the entrance wound on the victim's right temple, through the exit wound on the left side of her skull, to the bullet's final resting place inside the armrest of the couch."  Id.  At most,

the SJC stated, such a conclusion might require "basic familiarity with the operation of firearms," which the ballistic expert clearly possessed, having test-fired over 1,000 weapons and having worked as a State police ballistician for over eight years. Id. at 87-88. Accordingly, Castano has not shown a violation of due process.

For the foregoing reasons, this Court finds that Castano is not entitled to habeas relief on Ground Three of the Petition.

### D. The Decision To Deny Castano's Motion For New Counsel Was Neither Contrary To, Nor An Unreasonable Application Of, Federal Law

In Ground Four of the Petition, Castano argues that he was denied the right to counsel when the trial judge denied his request for new counsel on the second day of jury impanelment. Docket No. 1 at 25; Docket No. 25 at 24-28. "The Supreme Court has long recognized that a criminal defendant 'should be afforded a fair opportunity to secure counsel of his own choice.'" United States v. Myers, 294 F.3d 203, 206 (1st Cir. 2002) (quoting Powell v. Alabama, 287 U.S. 45, 53 (1932)). While that right extends to indigent defendants, "it does not afford them carte blanche in the selection of appointed counsel." Id. (citations omitted).

In addition, "[t]he right to counsel is subject to practical constraints." Tuitt v. Fair, 822 F.2d 166, 171 (1st Cir. 1987). Thus, a defendant's right to choose his own counsel "cannot be insisted upon in a manner that will obstruct reasonable and orderly court procedure." Id. (citations omitted). "[D]esirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of criminal justice." Id. (citation omitted).

The First Circuit has explained that:

> Once a court appoints an attorney to represent an accused, a subsequent decision to replace that attorney is committed to the informed discretion of the appointing court. In exercising that authority, the court must take into

17

> account the totality of the circumstances then obtaining (including the need for economy and efficiency in the judicial process). This means that there must be good cause for rescinding the original appointment and interposing a new one. Good cause depends on objective reasonableness; it cannot be gauged solely by ascertaining the defendant's state of mind. In other words, "[l]oss of trust, standing alone, is insufficient." By like token, not every bump in the road entitles a criminal defendant to have his lawyer cashiered and a new one appointed. At a bare minimum, good cause demands that a defendant's professed loss of confidence in his attorney be founded upon a legitimate reason.

Myers, 294 F.3d at 206-207 (internal citations omitted). "A trial court has extensive discretion over last-minute requests for continuances made in order to secure substitute counsel." Tuitt, 822 F.2d at 171.

In rejecting Castano's claim that the trial judge abused her discretion by denying his request for new counsel, the SJC noted that the trial judge stated "on the record and in considerable detail," that she had been closely observing the interactions between Castano and his attorney and that she "saw nothing to indicate . . . that any relationship ha[d] broken down." Castano, 478 Mass. at 88. The SJC also noted that the trial judge had determined that Castano's attorney acted "with the highest degree of professionalism," went "beyond the call of duty," and "communicat[ed] quite effectively" with Castano. Id. Given those findings, Castano has not shown that the SJC's decision was contrary to, or an unreasonable application of, clearly established federal law.

    E.    Castano's Actual Innocence Claim Has No Merit

In Ground Five of the Petition, Castano argues actual innocence. The Supreme Court has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (citing Herrera v. Collins, 506 U.S. 390, 404-405 (1993)). In any event, a credible claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether

it may be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." United States v. Marandola, 372 F. Supp. 3d 7, 11 (D.R.I. 2019) (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Id. (quoting Bousley v. United States, 523 U.S. 614, 623 (1998)).

Castano has not presented any new reliable evidence showing actual innocence. Rather, he simply presents his view of the evidence presented at trial. Docket No. 1 at 28. Accordingly, he cannot meet the heavy burden of demonstrating his actual innocence.

F. Reduction Of Verdict

Pursuant to M.G.L. c. 278, § 33E, the SJC reviews all first-degree murder appeals and may reduce the verdict. Castano challenges the SJC's decision not to reduce his verdict to a lesser offense pursuant to Section 33E. Docket No. 1 at 28 (arguing that "justice would be better served with a conviction to a lesser offense"). Such a challenge, however, is not cognizable in a federal habeas petition because it is not grounded in federal law. McAfee v. Roden, No. 09-10935-NMG, 2010 WL 4340634, at *3 (D. Mass. Nov. 1, 2010) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). Thus, the District Judge should deny this claim as well.

IV. RECOMMENDATION

For the foregoing reasons, this Court recommends that the District Judge assigned to this case deny Castano's Petition.

V. REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of service of this Report and

19

Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

                                                                  /s/ Jennifer C. Boal
                                                                  JENNIFER C. BOAL
                                                                  United States Magistrate Judge